IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

U.S. BANK NATIONAL ASSOCIATION, a
National Association, as Securities
Intermediary for LIMA ACQUISITION LP,

Case No. 12-CV-00877 (JRT/TNL)

Plaintiff,

v.

PHL VARIABLE INSURANCE
COMPANY, a Connecticut corporation,

Defendant.

**DEFENDANT PHL VARIABLE INSURANCE COMPANY'S
ORIGINAL ANSWER AND COUNTERCLAIM**

Defendant PHL Variable Insurance Company ("Defendant" or "Phoenix"),
responding to Plaintiff's Complaint, answers, avers and alleges as follows:

**INTRODUCTION**

1.      The allegations in paragraph 1 of the Complaint related to the damages and
relief sought by Plaintiff are legal conclusions to which no response is required.  Phoenix
denies all remaining allegations contained in paragraph 1 of the Complaint.

2.      Phoenix admits that it issued the Doe Policies and admits that it received
premiums.  Phoenix admits that it has received a death certificate indicating Mr. Doe
passed away on November 4, 2011.  Phoenix admits that it received submission of a
claim from U.S. Bank.  Phoenix was unaware for what party U.S. Bank was serving as a
securities intermediary prior to receiving this Complaint.  Phoenix denies all remaining
allegations contained in paragraph 2 of the Complaint.

3.      Phoenix admits only that Plaintiff filed the COI Action.  Phoenix denies all

remaining allegations contained in paragraph 3 of the Complaint.

4.     Phoenix denies the allegations contained in paragraph 4 of the Complaint.

5.     Phoenix denies the allegations contained in paragraph 5 of the Complaint.

## PARTIES

6.     Phoenix is without information or knowledge sufficient to form a belief as to the truth or accuracy of the allegations of paragraph 6 of the Complaint.

7.     Phoenix admits that it is a Connecticut insurance company authorized to transact the business of insurance in Minnesota.  Phoenix admits that it is organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut.  Phoenix admits that its headquarters are located at One American Row, Hartford, Connecticut 06102–5056 and that Phoenix's high-level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut.  Phoenix denies all remaining allegations contained in paragraph 7 of the Complaint.

## JURISDICTION AND VENUE

8.     The allegations in paragraph 8 of the Complaint are legal conclusions to which no response is required.

9.     The allegations in paragraph 9 of the Complaint are legal conclusions to which no response is required.

## FACTUAL ALLEGATIONS

10.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 10 of the Complaint.

11.     Defendant admits that an application for a life insurance policy on Mr.

2

Does' life was submitted to Phoenix and that the application speaks for itself.  Phoenix denies all remaining allegations contained in paragraph 11 of the Complaint.

12.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 12 of the Complaint.

13.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 13 of the Complaint.

14.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 14 of the Complaint.

15.     Phoenix admits only that it received and recorded a notice of Collateral Assignment.  Phoenix denies all remaining allegations contained in paragraph 15 of the Complaint.

16.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 15 of the Complaint.

17.     Phoenix admits only that the Policy speaks for itself.  Phoenix denies the remaining allegations contained in paragraph 17 of the Complaint.

18.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 18 of the Complaint.

19.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 19 of the Complaint.

20.     Phoenix admits only that the Minnesota Statutes and the Policy speaks for itself.   Phoenix  denies  the  remaining  allegations  contained  in  paragraph  20  of  the Complaint.

21.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 21 of the Complaint.

22.     Phoenix denies the remaining allegations contained in paragraph 22 of the Complaint.

23.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 23 of the Complaint.

24.     Phoenix admits only that it received premiums under the Policy.  Phoenix denies all remaining allegations contained in paragraph 24 of the Complaint.

25.     Phoenix denies the allegations contained in paragraph 25 of the Complaint.

26.     Phoenix admits only that it has received a death certificate indicating Mr. Doe died on November 4, 2011.  Phoenix denies all remaining allegations contained in paragraph 26 of the Complaint.

27.     Phoenix admits only that the letter speaks for itself.  Phoenix denies the remaining allegations contained in paragraph 27 of the Complaint.

28.     Phoenix admits the allegations contained in paragraph 28 of the Complaint.

29.     Phoenix admits only that it received documents, which speak for themselves.  Phoenix denies all remaining allegations contained in paragraph 29 of the Complaint.

30.     Phoenix admits only that it sent correspondence, which speaks for itself. Phoenix denies all remaining allegations contained in paragraph 30 of the Complaint.

31.     Phoenix admits only that it sent correspondence, which speaks for itself. Phoenix denies all remaining allegations contained in paragraph 31 of the Complaint.

4

32.     Phoenix denies the allegations contained in paragraph 32 of the Complaint.

33.     Phoenix admits only that it received documents, which speak for themselves.  Phoenix denies all remaining allegations contained in paragraph 33 of the Complaint.

34.     Phoenix admits only that it sent correspondence, which speaks for itself.  Phoenix denies all remaining allegations contained in paragraph 34 of the Complaint.

35.     Phoenix denies the allegations contained in paragraph 35 of the Complaint.

36.     Phoenix admits only that it received documents, which speak for themselves.  Phoenix denies all remaining allegations contained in paragraph 36 of the Complaint.

37.     Phoenix admits only that it sent correspondence, which speaks for itself.  Phoenix denies all remaining allegations contained in paragraph 37 of the Complaint.

38.     Phoenix admits only that it received documents, which speak for themselves.  Phoenix denies all remaining allegations contained in paragraph 38 of the Complaint.

39.     The allegations in paragraph 8 of the Complaint are legal conclusions to which no response is required.  To the extent a response is required, Phoenix denies all remaining allegations contained in paragraph 39 of the Complaint.

40.     Phoenix denies all remaining allegations contained in paragraph 40 of the Complaint.

## FIRST CAUSE OF ACTION
### For Breach of Contract (Express)

41.     Phoenix realleges all responses contained in paragraphs 1-40 above.

42.     Phoenix denies all allegations contained in paragraph 42 of the Complaint.

43.     Phoenix is without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations contained in paragraph 43 of the Complaint.

44.     Phoenix denies all allegations contained in paragraph 44 of the Complaint.

45.     Phoenix denies all allegations contained in paragraph 45 of the Complaint.

46.     Phoenix denies all allegations contained in paragraph 46 of the Complaint.

## SECOND CAUSE OF ACTION
### For Unjust Enrichment

47.     Phoenix realleges all responses contained in paragraph 1-47 above.

48.     Phoenix admits only that premium payments were made.  Phoenix denies all remaining allegations contained in paragraph 48 of the Complaint.

49.     Phoenix denies all allegations contained in paragraph 49 of the Complaint.

50.     Phoenix denies all allegations contained in paragraph 50 of the Complaint.

51.     Phoenix denies all allegations contained in paragraph 51 of the Complaint.

## PRAYER FOR RELIEF
### On the First Cause of Action

Paragraphs 1-4 are in the form of a prayer to the Court to which Phoenix need not respond.  To the extent a response is required, Phoenix denies that Plaintiff is entitled to any of the relief requested in paragraphs 1-4 of the Complaint.

## On the Second Cause of Action

Paragraphs 1-3 are in the form of a prayer to the Court to which Phoenix need not respond.  To the extent a response is required, Phoenix denies that Plaintiff is entitled to any of the relief requested in paragraphs 1-3 of the Complaint.

## AFFIRMATIVE DEFENSES

1.      Plaintiff's Complaint fails to state a claim upon which relief can be granted, and Phoenix reserves its right to move to dismiss the Complaint.

2.      Plaintiff's claims are barred, in whole or in part, because the application for the Policy contained material misrepresentations.

3.      Plaintiff's claims are barred, in whole or in part, because the application for the Policy contained fraudulent misrepresentations.

4.      Plaintiff's claims are barred, in whole or in part, because the Policy is void, *ab initio*, lacks insurable interest, and is an illegal wagering contract.

5.      Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

6.      Plaintiff's claims are barred, in whole or in part, by the doctrine of unjust enrichment.

7.      Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

8.      Plaintiff's claims are barred, in whole or in part, because Phoenix's conduct has, at all relevant times, been in good faith.

9.     Plaintiff's claims are barred, in whole or in part, because Plaintiff's acts and/or omissions caused or contributed to Plaintiff's alleged damages.

10.    Plaintiff's claims are barred, in whole or in part, because an award of the relief requested would produce an inequitable remedy and would not result in Phoenix being returned to its status quo ante.

11.    Plaintiff's claims are barred, in whole or in part, by the specific terms of the policy contract governing the Policy at issue.

12.    Plaintiff's claims are barred, in whole or in part, because the Policy is illegal and unenforceable.

13.    Plaintiff's claims are barred, in whole or in part, because any alleged damages caused to Plaintiff, if any, was caused by third parties not under Phoenix's control.

**WHEREFORE**, Defendant prays for judgment as follows:

1      That Plaintiff takes nothing by reason of its Complaint;

2.     For attorneys' fees and costs of suit incurred herein; and,

3.     For such other and further relief as the Court deems just and proper.

**DEFENDANT PHL VARIABLE INSURANCE COMPANY'S COUNTERCLAIM AGAINST PLAINTIFF U.S. BANK NATIONAL ASSOCIATION, NA, AS SECURITIES INTERMEDIARY FOR LIMA ACQUISITION LP**

Counter-plaintiff PHL Variable Insurance Company ("Phoenix"), by and through its attorneys, files this Counterclaim against U.S. Bank National Association, A National Association, as Securities Intermediary for Lima Acquisition LP ("U.S. Bank"), as follows:

1.     This is an action for Declaratory Judgment under 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Phoenix seeks to adjudicate its rights and obligations under a policy of life insurance bearing the number 97528505 (the "Policy") insuring the life of John Doe ("Mr. Doe"), who is now deceased.  Specifically, Phoenix seeks a declaration that the Policy is null and void *ab initio* due to the lack of an insurable interest at the Policy's issuance.

2.     As explained in greater detail below, Mr. Doe, with the assistance of others, executed a plan, scheme and/or design intended to procure a life insurance policy on Mr. Doe's life for the purpose of selling it on the secondary market.  In applying to Phoenix for this insurance, Mr. Doe and John Doe 2008A Irrevocable Trust (the "Trust"), by and through its trustee, BNC National Bank ("BNC"), made numerous misrepresentations concerning Mr. Doe's net worth and income, bona fide need for the insurance sought, and whether third-party investors would obtain any rights or interest in the applied-for policy.  Additionally, the Trust was created in order to disguise the illicit nature of this transaction and create the false perception that the Policy was purchased for legitimate estate planning purposes.  The Policy however, was not sought by Mr. Doe to meet his estate planning needs, but instead was sought by, and intended for the benefit of, investors who were complete strangers to Mr. Doe and who lacked a legally cognizable insurable interest in his life.

3.     Because the Policy lacked an insurable interest at its inception, it is null and void *ab initio*, and no death benefits are payable under the Policy.  As such, there is an

actual controversy of a justiciable nature concerning the rights and obligations of the parties under the Policy.

## THE PARTIES

4.      PHL Variable Insurance Company is a Connecticut insurance company authorized to transact the business of insurance in Minnesota.  Phoenix is organized under the laws of Connecticut with its principal place of business in Hartford, Connecticut.  Phoenix's headquarters are located at One American Row, Hartford, CT 06102–5056.    Phoenix's high level officers direct, control and coordinate the corporation's activities from Hartford, Connecticut.  As such, Phoenix is a citizen of the State of Connecticut within the meaning and intent of 28 U.S.C. § 1332.

5.      Upon information and belief, U.S. Bank is a national banking association with its principal place of business in Ohio, and is the securities intermediary for Lima Acquisition LP.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over all parties of this lawsuit under 28 U.S.C. § 1332(a)(1) because Phoenix and U.S. Bank are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest and costs.

7.      This Court has jurisdiction for the declaratory judgment action pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. §§ 2201 and 2202, which grant the United States District Courts jurisdiction to declare the "rights and other legal relations of any interested party making such declaration, whether or not further relief is or could be sought."

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because all or a substantial portion of the events or omissions giving rise to the cause asserted herein took place in the State of Minnesota.  U.S. Bank acquired the Policy from the Trust, which is a Minnesota statutory trust.  Additionally, the Policy was issued in Minnesota and is governed by Minnesota law.

## FACTUAL BACKGROUND

### A.     Stranger Originated Life Insurance

9.     In recent years, a derivative market for life insurance has developed in which existing life insurance policies and certificates are sold to third parties who lack an insurable interest in the life of the insured.  Typically referred to as a "life settlement", these sales are generally lawful, assuming that the policy was procured for legitimate purposes and that there was an insurable interest at the policy's inception.

10.     As this derivative market has developed however, there has been a proliferation of life insurance policies that are not sought for legitimate insurance needs, but rather for re-sale to strangers in the secondary market.  Policies procured under these circumstances have become known as stranger originated life insurance ("STOLI") policies.  STOLI policies are illegal wagering contracts that lack an insurable interest at inception.  As such, STOLI policies are void *ab initio*.

11.     Although the STOLI market has only recently come into existence, the underlying concept has persisted for over a century.  Indeed, in the late nineteenth and early twentieth centuries, the United States Supreme Court opined against unlawful "wagering contracts," and the "sinister counter interest" in the death of the insured that

results from the issuance of such policies.[1]   In an effort to prevent investors from speculating on the lives of others, many states have enacted insurable interest laws to protect the integrity of life insurance by requiring that a policy owner have a cognizable interest in the longevity of the insured at the time the policy is issued.  However, STOLI promoters have attempted to circumvent these laws by carefully constructing their transactions to hide the fact that the policies are not being procured to satisfy legitimate insurance needs, but instead are being procured as impermissible wagers.

12.     In order to maximize their potential return on investment, STOLI promoters will seek out individuals aged seventy years or older who are purportedly financially qualified for high face amount insurance policies.  This in turn allows STOLI promoters to acquire multi-million dollar life insurance policies on individuals who, actuarially speaking, are expected to have a relatively limited lifespan.  The perverse result is that the shorter life expectancy of these individuals makes them a more attractive investment to those who would gamble on the lives of these insureds.

13.     In many cases, STOLI policies are initiated with fraudulent representations during the application for insurance.  Insurers will not issue coverage unless there is a legitimate need for the insurance applied for, such as estate conservation or income replacement.  As such, insurers, in an effort to prevent issuing STOLI policies, require

---

[1] *See Grisby v. Russell*, 222 U.S. 149, 154–55 (1911) (explaining that an insurance policy lacking an insurable interest at inception merely serves as a cover for a "pure wager," which contradicts the precise purpose of a life insurance policy because it "gives the [policyholder] a sinister counter interest in having the insured's life come to an end."); *Warnock v. Davis*, 104 U.S. 775, 779 (1881) (condemning wagering contracts because they "have a tendency to create a desire for the [death of the insured] and are, therefore, independently of any statute on the subject, condemned, as being against public policy.").

insurance applicants to respond to specific questions during the application process regarding the insured's net worth and income, the purpose of the insurance sought and any intent to transfer the policy. STOLI promoters and insureds will falsely answer these questions in order to obtain the insurance sought. Additionally, in order to maximize their profit and/or to obtain high-face amount policies insuring individuals not qualified for such policies, STOLI promoters and insureds frequently provide insurers with false information regarding an insured's financial status.

14.     In furtherance of a STOLI scheme, the Trust, by and through its trustee, BNC, procured the Policy from Phoenix. In doing so, STOLI promoters caused the establishment of the Trust to give the false appearance that the Policy was being purchased for legitimate insurance purposes. In fact, the Trust was created to act as a vehicle to circumvent applicable insurable interest laws so that the Policy could be controlled by a third-party investor that lacked an insurable interest in Mr. Doe's life. Additionally, the Trust and Mr. Doe made numerous fraudulent misrepresentations relating to Mr. Doe's net worth and annual income, and the intent for investors to obtain an interest in the Policy.

15.     Because the Policy was fraudulently procured as a mere cover for an impermissible wagering contract, the Policy lacked a valid insurable interest at its inception and is therefore void.

16.     Had Phoenix known of the true facts concerning the application, it would not have issued the Policy.

17.     As such, Phoenix brings this action for an order declaring the Policy null and void *ab initio*.

**B.     The Procurement of the Doe Policy**

**i.   The Application for the Policy**

18.     Phoenix is, and during all relevant times has been, in the business of underwriting and issuing policies of life insurance and is authorized to transact the business of insurance in the State of Minnesota.

19.     On or about June 4, 2008, Phoenix received a written application form and related documents seeking the issuance of an insurance policy with a $3 million face amount insuring Mr. Doe's life.[2]  The application form represented that the Trust, which was created on June 2, 2008, was the proposed owner and sole beneficiary of the applied-for policy.  The Trust, by and through its trustee BNC, executed the application form as the policy owner.

20.     In applying for the Policy, the Trust and Mr. Doe provided Phoenix with material information regarding, among other things, Mr. Doe's net worth and income, the purpose for the insurance, and whether there was any intention that a third-party would obtain an interest in the applied for Policy.  In applying for the Policy, Mr. Doe and the Trust knew that they were required to provide complete, accurate and honest answers to the questions presented by Phoenix.  The Trust and Mr. Doe also knew that Phoenix

---

[2] Mr. Doe was also insured under a Phoenix policy issued in 1991 (the "1991 Policy"). Phoenix paid the death benefit on this policy to Mrs. Doe, the designated beneficiary.

would rely upon the answers given in determining whether Mr. Doe was insurable and qualified for the insurance sought through the application.

21.     Mr. Doe and the Trust, through its trustee, responded to clear, direct questions seeking material information regarding Mr. Doe's net worth and annual income.  In response to these questions, it was represented that Mr. Doe had a net worth of $3,500,000 and other income of $225,000.  The application also stated that the Policy was not being purchased in connection with any formal or informal program under which the proposed insured had been advised of the opportunity to transfer the Policy to a third party, that the Policy was sought for "estate liquidity" purposes, and that the insured had not received cash or other financial inducements in connection with the application or purchase of the Policy.   As discussed more fully in the ensuing paragraphs, these representations were false, were material to Phoenix's acceptance of the risk assumed, and were made with the intent that Phoenix rely upon them in issuing the Policy.

22.     The application form contained the following affirmation:

> I have reviewed this application, and the statements made herein are those of the proposed insured and all such statements made by the proposed insured in Part I or and in Part II of this application are full, complete, and true to the best knowledge and belief of the undersigned and have been correctly recorded.

Mr. Doe and the Trust, through its trustee, BNC, executed the Application on or about June 4, 2008.

### ii.   The Issuance of the Doe Policy

23.   On the basis of the statements and representations made during the application process, and in reliance upon Mr. Doe and the Trust's complete candor, honesty and openness in disclosing information in response to the questions presented, Phoenix offered the Policy to the Trust, with a planned first year premium of $186,000, a policy date of January 21, 2008, and face amount of $3,000,000.  The Policy is governed by Minnesota law.

24.   In order to place the Policy in force, Phoenix required that it receive an executed policy acceptance form and payment of premium.  On or about June 23, 2008, the Trust, through its trustee, executed the policy acceptance form.  Phoenix subsequently received payment of premiums.

25.   On or about October 1, 2009 the ownership of the Policy was formally transferred to U.S. Bank National Association, as securities intermediary.

## C.   Phoenix's Investigation of the Doe Policy

26.   Following Mr. Doe's death, Phoenix began processing claims for both the 1991 Policy and the Policy.  During this process, Mrs. Doe alerted Phoenix that she was unaware that the Policy had been issued and indicated that Mr. Doe had not consented to issuance of the Policy.  Phoenix informed Plaintiff of this development, and requested Plaintiff provide Phoenix with documentation related to this issuance of the Policy and reflecting how Plaintiff, an investor with no insurable interest in Mr. Doe's life, had obtained control of the Policy.  Plaintiff refused to provide this documentation to Phoenix and instead, initiated this lawsuit.

16

27.     Phoenix, meanwhile, investigated the circumstances leading to the issuance of the Policy.  Mrs. Doe stated that she and her husband had been approached by John Bovina and told that they could receive an immediate, $90,000 cash payment in exchange for agreeing to be insured under policies that would be payable to investors upon the Does' deaths.  Mrs. Doe stated that they had provided medical information to Bovina, but that they were told that the deal fell through and that there would be no policy issued. Mrs. Doe was not aware that the Policy had been issued until after her husbands' death. Mrs. Doe further stated that the net worth and income represented on the application were false, that she and her husband could not have afforded to pay the scheduled premiums for the Policy, that she and her husband had no intent to keep the Policy, and that they had only looked into becoming insured because they were promised $90,000 in cash. Rather than being millionaires with a $225,000 yearly income, the Does were, in reality, retirees living on social security and a modest pension, without a million-dollar net worth and without a six-figure income.  The Does simply had no sizeable estate and had no legitimate need for $3 million in insurance.

28.     STOLI promoters, using the Trust as a vehicle to perpetuate a fraud against Phoenix, caused the Trust to apply for the Policy, made numerous false representations on the application for the Policy, knowing that the representations were false and intending for Phoenix to rely on the false representations when issuing the Policy.  Based on Mrs. Doe's statement, Mr. Doe may not have known that the Policy was ever issued and may not have consented to its issuance.  Moreover, even if Mr. Doe knew the Policy was issued, the application for the Policy was done with the intent and agreement that it

17

would be transferred to a third-party investor who lacked an insurable interest in Mr. Doe's life.  Mrs. Doe confirmed that her husband only agreed to provide his medical information because he was promised a $90,000 cash payment.

29.     Upon information and belief, Mr. Doe did not have any significant assets or income.  The Trust knew that Mr. Doe did not have a net worth of $3,500,000 or income of $225,000 at the time it executed the Application, but falsely recorded this information on the Application in order to obtain a life insurance policy for which Mr. Doe was not qualified.  Upon information and belief, the Trust intended to transfer the Policy to a third-party investor.  The Trust made false representations to the contrary in order to obtain the Policy.  Upon information and belief, the Trust knew that Mr. Doe or a related party or entity would receive cash or other inducement in connection with the application for and purchase of the Policy.  The Trust made false representations to the contrary in order to obtain the Policy.  Upon information and belief, the Trust knew that the Policy was being purchased with the intent that a third-party investor, which lacked an insurable interest in Mr. Doe's life, would obtain an interest in and control over the Policy.  The Trust made false representations to the contrary in order to obtain the Policy.

30.     Had Mr. Doe and the Trust provided Phoenix with accurate information regarding these items during the application process, Phoenix would not have issued the Policy.

31.     Phoenix has suffered damages as a result of the Trust's misrepresentations and fraud, including compensation paid to insurance brokers, internal costs incurred in

placing, administering and servicing the Policy, and costs incurred in investigating and seeking a declaration that the Policy is void.

32.     Phoenix brings this action seeking an order that the Policy is null and void *ab initio*.

### <u>DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST</u>

33.     Phoenix incorporates herein by reference each of its allegations contained in Paragraphs 1–32 above.

34.     Pursuant to the Federal Declaratory Judgment Statute, 28 U.S.C. § 2201, Phoenix seeks a declaratory judgment that the Policy is null and void *ab initio* due to the lack of an insurable interest and as an illegal wagering contract.  The Policy was purchased with the intent and agreement to benefit a third party, which lacked the requisite insurable interest in Mr. Doe's life at the time of the Policy's issuance.  The Policy's issuance violates the letter and spirit of Minnesota's insurable interest laws and is inconsistent with the state's public policy of prohibiting wagering on the lives of others.  The application for and purported ownership of the Policy by the Trust was merely a sham transaction intended to circumvent applicable insurable interest laws and public policy.  The Policy is, therefore, null and void *ab initio* and is of no force and effect from its inception.

35.     Phoenix hereby fully and unconditionally tenders the Policy's premiums to the Court's registry.

36.     Notwithstanding paragraph 35, Phoenix seeks an order that it may retain all premiums paid on the Policy.

WHEREFORE, Phoenix demands judgment against U.S. Bank National Association, a National Association as Securities Intermediary for Lima Acquisition LP, as follows:

a. An order declaring and adjudging the Policy of life insurance bearing Policy Number 97528505 to be null and void *ab initio*;

b. an order that Phoenix deposit with the Clerk of the Court all premiums paid on the Policy along with the required interest, if any;

c. an order that the Clerk of Court return to Phoenix all of the premiums deposited with the Court or, alternatively, an order that the Clerk of the Court pay to Phoenix from the premiums deposited an amount equal to: 1) the compensation paid by Phoenix to any brokers arising out of or relating to the sale of the Policy; and 2) any damages incurred by Phoenix as a result of the Policy's issuance and subsequent investigation, including attorneys' fees and expenses;

g. reasonable and necessary attorneys' fees and other costs incurred in this action;

h. pre-judgment and post-judgment interest at the maximum lawful rate;

i. costs of court; and

j. such other and further relief as the Court deems equitable and just to Phoenix.

FRUTH, JAMISON & ELSASS, PLLC


Dated:   May 15, 2012                    By  s/ Douglas L. Elsass
                                                Douglas L. Elsass (#219241)
                                                Adam A. Gillette (#0328352)
                         3902 IDS Center
                         80 South Eighth Street
                         Minneapolis, MN 55402
                         (612) 344-9700

                         *ATTORNEYS FOR DEFENDANT*
                         *PHL VARIABLE INSURANCE COMPANY*

OF COUNSEL:

EDISON, MCDOWELL & HETHERINGTON LLP

Thomas F.A. Hetherington*
Texas Bar No. 24007359
Jarrett E. Ganer*
Texas Bar No. 24055520
Phoenix Tower
3200 Southwest Freeway, Suite 2100
Houston, Texas 77027
Telephone: (713) 337-5580
Facsimile: (713) 337-8850
tom.hetherington@emhllp.com
jarrett.ganer@emhllp.com
**\*** *Applications for admission pro hac vice to be filed.*