**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, a National Association, as Securities Intermediary for LIMA ACQUISITION LP, | CASE NO.: 12-CV-00877(JRT/TNL) |
| Plaintiff, | **JURY TRIAL REQUESTED** |
| v. | |
| PHL VARIABLE INSURANCE COMPANY, a Connecticut corporation, | |
| Defendant. | |

**FIRST AMENDED COMPLAINT**

Plaintiff U.S. Bank National Association, as securities intermediary for Lima Acquisition LP ("Plaintiff"), hereby files this complaint against defendant PHL Variable Insurance Company ("Phoenix" or "Defendant"), and alleges as follows:

**INTRODUCTION**

1.  Plaintiff brings this action seeking compensatory and consequential damages, punitive damages, equitable relief, and attorneys' fees based on Phoenix's unjustified refusal to pay the death benefit due under a $3 million dollar life insurance policy insuring the life of Mr. John Doe (the "Doe Policy" or "Policy").[1]

2.  Phoenix issued the Doe Policy more than four years ago, and since issuing the Policy, Phoenix has received $389,000 in premiums paid to keep the Doe Policy in

---

[1] For privacy reasons, Plaintiff has substituted "John Doe" for the name of the actual insured.

force.  Mr. Doe passed away on November 4, 2011.  Shortly thereafter, Plaintiff, as the current owner of the Policy, timely submitted a proof of loss to Phoenix seeking payment of the death benefit under the Policy.  Phoenix, however, has failed and refused to pay the death benefit, making various pretextual and unjustified excuses for its refusal in blatant violation of its obligations under the Policy, and with a willful, reckless, and/or wanton disregard of Plaintiff's rights.

3. Upon information and belief, Phoenix has deliberately failed and refused to pay this claim, along with claims submitted on a number of other policies owned by Plaintiff, in retaliation for Plaintiff filing a lawsuit alleging that Phoenix unlawfully raised the cost of insurance rates on many of Plaintiff's and other policyholders' policies. Plaintiff filed that lawsuit, *U.S. Bank National Association v. PHL Variable Insurance Company*, Case No. 2:11-cv-09517-OD (RZx) (the "COI Action"), in the Central District of California on November 16, 2011.

4. Before Plaintiff filed the COI Action, Phoenix promptly paid the death benefit on a claim under one of Plaintiff's other policies, but since Plaintiff filed the COI Action, Phoenix has consistently failed to pay any of Plaintiff's death benefit claims. Plaintiff has thus been forced to file two other lawsuits, in addition to this one, seeking payment under other policies whose death benefits Phoenix has failed to pay.  In other words, while the rest of the life insurance industry, on average, denies less than 1% of all death benefit claims, Phoenix has failed to pay 100% of Plaintiff's death benefit claims submitted since the COI Action was filed.

5. By improperly refusing to pay the death benefit under the Policy, Phoenix has forced Plaintiff to incur the substantial expense and delay of litigation in order to obtain the benefits of the Policy, even after Phoenix collected premiums on it for approximately four years.

6. Phoenix's conduct is not only a breach of its express obligations under the terms of the Policy and other policies, it also constitutes a pattern of unfair claims handling in violation of Connecticut's Unfair Trade Practices Act and the Unfair Insurance Practices Act. Phoenix, a Connecticut insurer, is unquestionably subject to the provisions of those statutes.

## PARTIES

7. Plaintiff U.S. Bank National Association, is a national banking association with its principal place of business in Ohio, and is the securities intermediary for Lima Acquisition LP.

8. Upon information and belief, Phoenix is a Connecticut insurance corporation with its principal place of business and nerve center in Hartford, Connecticut, and Phoenix is authorized to do business in the State of Minnesota and regularly conducts its business in the State of Minnesota.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) and (a)(2) because Defendant resides in this judicial district, and a substantial part of the events giving rise to the claims occurred in this judicial district, including issuance of the Policy in Minnesota to a Minnesota trust.

## FACTUAL ALLEGATIONS

11. On or about June 2, 2008, John Doe established a Minnesota trust called the John Doe 2008A Irrevocable Trust (the "Doe Trust") pursuant to the John Doe 2008A Irrevocable Trust Agreement (the "Doe Trust Agreement").[2] The original trustee of the Doe Trust was BNC National Bank ("BNC"), which held the Policy in Minnesota. The original beneficiary of the Doe Trust was Jane Doe, Mr. Doe's wife. The Trust Agreement contemplated that the Trust would take out a loan from PFG Private Financing, LLC ("PFG") and use the loan proceeds to finance the purchase of a life insurance policy on Mr. Doe's life.

12. On or about June 4, 2008, Mr. Doe, along with BNC, in its capacity as trustee of the Doe Trust, submitted an application to Phoenix for a life insurance policy on Mr. Doe's life. In the application, Mr. Doe specifically disclosed that he intended to finance the premiums for the policy through a loan from PFG. Section XI, question 9 of the application asked, "Will the owner, now or in the future pay premiums funded by an individual and/or entity other than the proposed insured?" Mr. Doe checked the box marked "Yes" and wrote in, "Borrowed funds from PFG Private Funding."

---

[2] As noted above, "John Doe" has been substituted for the true name of the insured, including within the name of the Trust. For the same privacy reasons, "Jane Doe" has been substituted for the true name of the insured's spouse.

4

13. On or about June 13, 2008, as contemplated in the Doe Trust Agreement and related documents, Mr. Doe and BNC, in its capacity as trustee of the Trust, entered into a Term Financing Facility Agreement with PFG (the "Doe Financing Agreement"). Under the Doe Financing Agreement, PFG agreed to lend the Doe Trust a total of $257,200 to purchase the Doe Policy. The parties to the Doe Financing Agreement executed several other documents in conjunction with the loan that PFG extended to the Doe Trust, including a Borrower Pledge and Security Agreement, whereby the Doe Trust pledged the Doe Policy as security for the Doe Trust's obligations to repay the loan to PFG.

14. Mr. Doe agreed to personally guarantee the repayment of 25% of the Doe Trust's debt to PFG on terms set forth in a Limited Personal Guarantee executed in conjunction with the Doe Financing Agreement.

15. BNC, in its capacity as trustee, collaterally assigned the Doe Policy to PFG, as security for the Trust's debt.

16. PFG sent notice of the collateral assignment to Phoenix, which Phoenix received on or around June 16, 2008. On the same day, Phoenix sent a letter to BNC, in its capacity as trustee, and Mr. Doe, acknowledging receipt of the collateral assignment and notifying BNC that it would record the collateral assignment when it issued the Doe Policy.

17. PFG also filed a public UCC Financing Statement indicating that PFG was a secured creditor of BNC, as trustee for the Doe Trust, and that the Doe Policy served as collateral securing the Doe Trust's obligations to PFG.

18. Phoenix issued the Doe Policy, Policy No. 97528505, with a face value of $3,000,000 and delivered it to the trustee of the Doe Trust and Mr. Doe on June 23, 2008. A copy of the Doe Policy is attached hereto as <u>Exhibit 1</u>.[3] The Policy was issued with an Issue Date and Policy Date of January 21, 2008. The Doe Trust was listed as the sole owner and beneficiary of the Policy.

19. Upon information and belief, the terms of the PFG premium finance loan, including the provisions of the Doe Financing Agreement (defined above) and related documents, were all disclosed to Phoenix before Phoenix issued the Doe Policy.

20. Upon information and belief, the terms of the PFG premium finance loan, including the provisions of the Doe Financing Agreement and related documents, were all approved by Phoenix before Phoenix issued the Doe Policy.

21. Minnesota Statutes section 61A.03 requires that every life insurance contract include a provision that the policy "is incontestable after it has been in force during the lifetime of the insured for two years from its date." Section 21 of the Policy provides that the "policy shall be incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date . . . ."

22. On August 21, 2009, the Trust and PFG entered into a Delayed Transfer Agreement (the "Doe Transfer Agreement"), pursuant to which the Doe Trust agreed to transfer the Doe Policy to PFG in satisfaction of the full amount of the loan. Mr. Doe, Mrs. Doe, and the Doe Trust all consented to the transfer of the Doe Policy in writing.

---

[3] Some of the policy information in the exhibits hereto have been redacted for privacy reasons.

6

23. On or about October 1, 2009, the Doe Trust sent Phoenix a Designation of Owner and Designation of Beneficiary form indicating the change of ownership of the Doe Policy to PFG. One week later, on October 8, 2009, Phoenix sent a letter to BNC, as trustee for the Doe Trust, stating that Phoenix had recorded the change of the owner and beneficiary under the Doe Policy.

24. Plaintiff subsequently acquired the Doe Policy after the expiration of the contestability period, and Plaintiff thereafter continued to make all premium payments on the Doe Policy.

25. From the time the Doe Policy was issued until the Policy matured, all of the premiums that were due under the Doe Policy were paid. Indeed, throughout the contestability period and after, Phoenix continued to accept premiums on the Policy, including $194,000 in premiums that were paid after the policy became incontestable. In total, Phoenix received $389,000 in premiums on the Policy.

26. Additionally, on September 22, 2010, well after the contestability period, Phoenix provided a Verification of Coverage for the Policy, and did not raise any questions about the Policy, or indicate that there were any issues with it.

27. Mr. Doe died on November 4, 2011, while the Policy was in force. The Policy states: "If the Insured dies while the policy is in force, we will pay the Death Proceeds, as described below, upon receipt of due proof of death of the Insured no later than two months after receipt of such proof, subject to any applicable provisions of the policy." Policy, p. 9 (Exhibit 1).

28.   Upon information and belief, Phoenix became aware of Mr. Doe's death shortly after his death on November 4, 2011.  On November 14, 2011, Phoenix sent a letter to Mr. Doe's widow requesting certain documents needed to process a claim for the death benefit.  The letter requested:  (a) a certified copy of the death certificate; (b) completion and return of an enclosed Beneficiary Statement; (c) completion of an enclosed Affidavit as to the Extent of Interest form; and (d) return of the policy.  Phoenix did not at this time express any concerns or issues about the Doe Policy.  A copy of Phoenix's correspondence dated November 14, 2011 is attached hereto as <u>Exhibit 2</u>.

29.   On November 16, 2011, Plaintiff filed the COI Action.

30.   On December 22, 2011, Plaintiff submitted a claim to Phoenix requesting payment of the death benefit owed under the Doe Policy.  Plaintiff also provided Phoenix with all of the documents requested in Phoenix's November 14, 2011 letter, including a copy of Mr. Doe's death certificate, a completed Beneficiary Statement and completed Affidavit as to the Extent of Interest, and the original Policy.

31.   Phoenix responded to Plaintiff's claim by letter dated January 6, 2012, in which it asserted that "issues" had been raised concerning Mr. Doe's consent to the Doe Policy, the circumstances surrounding the Doe Policy's application, and the existence of an insurable interest at the time of issuance.  A copy of Phoenix's correspondence dated January 6, 2012 is attached hereto as <u>Exhibit 3</u>.

32.   Phoenix did not specify what "issues" had been raised, or the basis for its belief that a valid insurable interest may not have existed at the time the Doe Policy was issued.  Rather, Phoenix vaguely stated that it would be conducting an investigation into

8

"the circumstances surrounding Mr. Doe's application for the Policy" over three years earlier.

33.     In an obvious attempt to engage in post-claim underwriting well after the expiration of the contestability period, Phoenix also demanded that Plaintiff produce a host of documents in connection with its investigation, most of which had nothing to do with Mr. Doe's consent to the Policy or the existence of an insurable interest at the time the Policy was issued, and many of which Phoenix likely had in its possession.

34.     Plaintiff responded to Phoenix's demands in a letter dated January 20, 2012.  Plaintiff advised that it had already provided Phoenix with a copy of Mr. Doe's death certificate, a completed Beneficiary Statement, a completed Affidavit as to the Extent of Interest, and the original Doe Policy, which was all that was required for Phoenix to process the claim.  Plaintiff then made a second request that Phoenix pay the claim.  Plaintiff also explained that, as Phoenix already knew, the Policy was originally issued to the Doe Trust as the original owner and beneficiary of the Policy.  The original beneficiary of the Doe Trust was Jane Doe, Mr. Doe's wife.  Under Minnesota law, Mrs. Doe indisputably had an insurable interest in Mr. Doe's life.  A copy of Plaintiff's correspondence dated January 20, 2012 is attached hereto as <u>Exhibit 4</u>.

35.     Notwithstanding its clear obligation to pay the death benefit, on January 27, 2012, Phoenix responded to Plaintiff's January 20, 2012 letter by once again refusing to pay the death benefit, insisting that Mrs. Doe had "raised issues concerning Mr. Doe's lack of consent to the insurance and the circumstances surrounding the application or the Policy and the establishment of the Trust."  A copy of Phoenix's correspondence dated

January 27, 2012 is attached hereto as <u>Exhibit 5</u>.

36.     Phoenix's purported concern about whether Mr. Doe "consented" to the insurance was clearly disingenuous given that Mr. Doe signed the Policy application, the Policy, and the Policy Delivery Receipt, among many other documents he signed and submitted to Phoenix when he obtained the Policy.

37.     Nevertheless, on February 16, 2012, in response to Phoenix's alleged concerns about whether Mr. Doe consented to the insurance, Plaintiff provided Phoenix with a copy of an Acknowledgment and Consent by Insured, Insured's Spouse and Beneficiary (the "Consent"), which was executed by Mr. and Mrs. Doe and notarized on August 21, 2009 in conjunction with Mr. and Mrs. Doe's execution of the Delayed Transfer Agreement.  In the Consent, Mr. and Mrs. Doe represented and warranted, among many other things, that the transfer of the Doe Policy was made on their "own initiative, (b) voluntarily, (c) willingly, (d) without any undue influence or financial duress, . . . (h) after considering the advantages and disadvantages of a sale of the Policy and the other alternatives available, including retaining or otherwise selling the Policy, or borrowing against the cash value of, or surrendering the Policy . . . ." Consent § 1.7.  A copy of Plaintiff's correspondence dated February 16, 2012 is attached hereto as <u>Exhibit 6</u>.

38.     On March 1, 2012, more than two months after Plaintiff submitted a claim under the policy and after the time during which Phoenix was required to pay the death benefit under the express terms of the Policy, Phoenix acknowledged receipt of the Consent but once again refused to pay the death benefit.  Phoenix claimed it was still

evaluating "the circumstances surrounding the issuance of the Policy."  Phoenix also continued to demand that Plaintiff produce all of the numerous categories of documents that it originally demanded in its correspondence dated January 6, 2012, including, among other things, documents "reflecting the income and net worth of Mr. Doe at the time the policy was applied for" and documents "reflecting any estate plan developed for Mr. Doe."  A copy of Phoenix's correspondence dated March 1, 2012 is attached hereto as Exhibit 7.

39.   Not only does Plaintiff not have many of these documents, but such documents have nothing to do with Phoenix's purported concern about Mr. Doe's consent to the insurance or whether the policy was issued to someone with an insurable interest.  Phoenix's requests were nothing more than an attempt to re-underwrite the Policy after learning of Mr. Doe's death. Indeed, Phoenix never disputed that the Policy was originally issued to the Doe Trust and that the original beneficiary of the Doe Trust was Mr. Doe's wife, who clearly had an insurable interest in Mr. Doe's life.  Thus, on March 9, 2012, Plaintiff made a final demand that Phoenix pay the death benefit under the Policy.  A copy of Plaintiff's correspondence dated March 9, 2012 is attached hereto as Exhibit 8.

40.   Minnesota Statutes section 72A.201, subdivision 4(11) requires an insurer to advise the insured in writing of the acceptance or denial of a claim "within 60 business days after receipt of a properly executed proof of loss."  Subdivision 4(11) further provides that "[n]o insurer shall deny a claim on the grounds of a specific policy provision, condition, or exclusion unless reference to the provision, condition, or

exclusion is included in the denial." It has been more than 60 business days since Plaintiff filed the proof of loss on December 22, 2011, and Plaintiff has not received any notice that complies with section 72A.201.

41.    As of the date hereof, Phoenix still has failed and refused to pay the death benefit under the Doe Policy.

## FIRST CAUSE OF ACTION

### For Breach of Contract

42.    Plaintiff realleges the allegations contained in paragraphs 1 through 41.

43.    The Doe Policy is a binding and enforceable contract of insurance issued by Defendant.

44.    Plaintiff is the current owner and beneficiary of the Doe Policy.

45.    Plaintiff has performed all of its obligations under the Doe Policy.

46.    Defendant breached the Doe Policy by failing and refusing to pay the death benefit due under the Policy.

47.    As a direct and proximate cause of Defendant's material breaches of the Policy, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### For Unjust Enrichment

48.    Plaintiff realleges the allegations contained in paragraphs 1 through 47.

49.    The premiums due under the Policy were fully paid to Defendant, by Plaintiff and prior owners of the Policy, through the maturation of the Policy.

50.    Defendant has retained these premium payments and has refused to pay the

benefit due under the Policy.

51. Defendant's retention of the premiums and refusal to pay the benefit under the Policy has unjustly enriched Defendant at Plaintiff's expense.

52. As a direct and proximate cause of Defendant's conduct, Plaintiff seeks an order requiring Defendant to pay the death benefit due under the Policy.

### THIRD CAUSE OF ACTION

### For Violation of the Connecticut Unfair Trade Practices Act

### Conn. Gen. Stat. §§ 42-110a, *et seq*.

53. Plaintiff realleges the allegations contained in paragraphs 1 through 52.

54. The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."

55. Defendant, a Connecticut corporation with its principal place of business in Connecticut, has engaged in "unfair" conduct, as alleged herein, of a "trade" or "commerce" as defined in Conn. Gen. Stat. §42-110a.

56. Among other violations of the Unfair Trade Practices Act, Defendant, as part of its general claims handling practices, has: (i) made misrepresentations regarding the facts relating to coverage under the Policy and other policies, including claiming that there were "issues" regarding the consent to the insurance and the existence of an insurable interest, where it knew there were no such issues; (ii) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iv) refused to pay unquestionably valid

claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage of claims within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

57. Defendant's conduct violates (among other applicable provisions of Connecticut law), the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b(a), and the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(6)(a)-(e), and (n).

58. As a direct and proximate cause of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

59. Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

60. Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. 42-110g(d).

61. In compliance with Connecticut General Statutes § 42-110g(c), a copy of this Complaint has been mailed to the Attorney General of the State of Connecticut and the Connecticut Commissioner of Consumer Protection on this date.

# **FOURTH CAUSE OF ACTION**

## **For Violation of the Connecticut Unfair Insurance Practices Act**

## **Conn. Gen. Stat. §§ 38a-815,** *et seq***.**

62. Plaintiff realleges the allegations contained in paragraphs 1 through 61.

63. The Connecticut Unfair Insurance Practices Act prohibits any "unfair or deceptive act or practice in the business of insurance" by any Connecticut insurer, including acts defined by statute as unfair claims handling.

64. Defendant, a Connecticut corporation with its principal place of business in Connecticut, engaged in "unfair" practices in the business of insurance, as alleged herein.

65. Among other violations of the Unfair Insurance Practices Act, Defendant, as part of its general claims handling practices, has: (i) made misrepresentations regarding the facts relating to coverage under the Policy and other policies, including claiming that there were "issues" regarding the consent to the insurance and the existence of an insurable interest, where it knew there were no such issues; (ii) failed to act with reasonable promptness upon communications regarding the Policy and other policies; (iii) failed to adopt and implement reasonable standards for the prompt investigation of claims brought under the Policy and other policies; (iv) refused to pay unquestionably valid claims without conducting a reasonable investigation and despite available information establishing the validity of such claims; (v) failed to affirm or deny coverage of claims within a reasonable time; and (vi) failed to promptly provide a reasonable explanation of the basis for denial of a claim.

66. Defendant's conduct violates (among other applicable provisions of

Connecticut law) the Connecticut Unfair Insurance Practices Act, including Conn. Gen. Stat. §§ 38a-816(6)(a)-(e), and (n).

67. As a direct and proximate cause of Defendant's unfair and deceptive acts and practices, Plaintiff has been damaged as alleged herein in an amount to be proven at trial.

68. Because Defendant acted with a willful, reckless and/or wanton indifference to Plaintiff's rights, it is also liable for punitive damages pursuant to Conn. Gen. Stat. § 42-110g(a).

69. Plaintiff is also entitled to recover its costs and reasonable attorneys' fees incurred in prosecuting this action pursuant to Conn. Gen. Sta. 42-110g(d).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

### **On the First Cause of Action**

1. For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

2. For an award of pre-judgment and post-judgment interest;

3. For the costs of the suit herein incurred, including reasonable attorneys' fees to the extent permitted by law; and

4. For such other and further relief as the Court may deem proper.

### **On the Second Cause of Action**

1. For an order requiring Defendant to pay the benefits due under the Policy;

2. For the costs of the suit herein incurred, including reasonable attorneys'

fees to the extent permitted by law; and

    3.    For such other and further relief as the Court may deem proper.

## On the Third Cause of Action

    1.    For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

    2.    For an award of consequential damages and lost profits, in an amount to be determined at trial;

    3.    For an award of pre-judgment and post-judgment interest;

    4.    For the costs of the suit herein incurred, including reasonable attorneys' fees;

    5.    For punitive damages; and

    6.    For such other and further relief as the Court may deem proper.

## On the Fourth Cause of Action

    1.    For damages in an amount to be determined at trial, but not less than the benefits due on the Doe Policy;

    2.    For an award of consequential damages and lost profits, in an amount to be determined at trial;

    3.    For an award of pre-judgment and post-judgment interest;

    4.    For the costs of the suit herein incurred, including reasonable attorneys' fees;

    5.    For punitive damages; and

    6.    For such other and further relief as the Court may deem proper.

| | |
|---|---|
| DATE:  May 24, 2012 | s/ Kadee J. Anderson<br>THOMAS F. NELSON (#154040)<br>STEVEN P. ZABEL (#235866)<br>KADEE J. ANDERSON (#389902)<br>Leonard, Street and Deinard<br>  Professional Association<br>150 South Fifth Street, Suite 2300<br>Minneapolis, MN  55402<br>Telephone: (612) 335-1500<br><br>*Of Counsel:*<br><br>STEPHEN G. FORESTA<br>PHILIPP SMAYLOVSKY<br>Orrick, Herrington & Sutcliffe LLP<br>51 West 52nd Street<br>New York, NY 10019-6142<br>Telephone:  (212) 506-3742<br>Facsimile:  (212) 506-5151<br><br>KHAI LEQUANG<br>MELANIE D. PHILLIPS<br>Orrick, Herrington & Sutcliffe LLP<br>777 South Figueroa Street<br>Suite 3200<br>Los Angeles, California  90017<br>Telephone:   213-629-2020<br>Facsimile:    213-612-2499<br><br>Attorneys for Plaintiff U.S. Bank National Association, as Securities Intermediary for Lima Acquisition LP |