## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, *a National Association, as Securities Intermediary for Lima Acquisition LP*, | Civil No. 12-877 (JRT/TNL) |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S PARTIAL MOTION TO DISMISS** |
| v. | |
| PHL VARIABLE INSURANCE COMPANY, | |
| Defendant. | |

Nancy E. Harris, Khai Lequang, Philipp Smaylovsky, Shaila Rahman Diwan, and Stephen G. Foresta, **ORRICK, HERRINGTON & SUTCLIFFE LLP**, 51 West Fifty Second Street, New York, NY 10019; Kadee Jo Anderson, Thomas F. Nelson, and Steven P. Zabel, **LEONARD STREET & DEINARD, PA**, 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402; and Brian L. Stekloff and David K. Kessler, **PAUL WEISS RIFKIND WHARTON & GARRISON LLP**, 2001 K Street, Northwest, Washington, DC 20006, for plaintiff.

Thomas F. A. Hetherington, Jarett E. Ganer, Shannon A. Lang, Jason A. Richardson, and Hutson B. Smelley, **EDISON MCDOWELL & HETHERINGTON LLP**, 3200 Southwest Freeway, Suite 2100, Houston, TX 77027; and Douglas L. Elsass and Adam A. Gillette, **FRUTH JAMISON & ELSASS PA**, 80 South Eighth Street, Suite 3902, Minneapolis, MN 55402, for defendant.

Plaintiff U.S. Bank National Association ("US Bank") brings four causes of action – breach of contract, unjust enrichment, violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), and fraud – against defendant PHL Variable Insurance Company ("PHL"). The claims arise from PHL's refusal to pay benefits that US Bank

contends it was owed as beneficiary of a life insurance policy.  PHL moves to dismiss US Bank's CUTPA claim and its fraud claim.  For the reasons explained below, the Court will deny PHL's motion to dismiss US Bank's CUTPA claim.  The Court will also deny PHL's motion to dismiss US Bank's fraud claim to the extent that the claim is premised on fraudulent nondisclosures, but it will grant PHL's motion to dismiss US Bank's fraud claim to the extent that the claim is premised on affirmative misrepresentations.

## BACKGROUND

### I.   THE DOE POLICY

On or about June 2, 2008, John Doe established a trust ("the Doe Trust") to take out a loan to finance the purchase of a life insurance policy ("the Policy").  (Second Am. Compl. ("SAC") ¶ 25, Nov. 19, 2012, Docket No. 39.)  The original trustee was BNC National Bank ("BNC") and the original beneficiary was Mr. Doe's wife.  (*Id.*)  On or about June 4, 2008, Mr. Doe, along with BNC as trustee of the Doe Trust, applied for a life insurance policy with PHL, indicating that Mr. Doe's net worth was $3,500,000 and his annual income was $225,000.  (*Id.* ¶ 26.)  Mr. Doe indicated in the application that he had borrowed funds from PFG Private Financing, LLC, ("PFG")[1] to pay the Policy's premiums.  (*Id.* ¶ 28.)  In addition to being aware that Mr. Doe was financing the Policy with funds borrowed from a third party, PHL was aware that the Policy was assigned to the third party as security for the debt.  (*Id.* ¶¶ 30-32.)

---

[1] The loan was funded by an unaffiliated entity, PFG Loans Funding, LLC, ("PFG Loans Funding") and PFG transferred its rights in the debt to this entity.  (*Id.* ¶ 31.)

On June 23, 2008, PHL issued the Policy with a face value of $3,000,000.  (*Id.* ¶ 37.)  The Doe Trust was listed as the sole owner and beneficiary.  (*Id.*)  Mr. Doe signed PHL's Policy Acceptance form on the same date.  (*Id.* ¶ 39.)

On August 21, 2009, PFG Loans Funding and the Doe Trust agreed that the Doe Trust would transfer the Policy to PFG Loans Funding in satisfaction of the full amount of the loan.  (*Id.* ¶ 40.)  Mr. Doe, his wife, and the Doe Trust all consented in writing to the transfer of the Policy.  (*Id.* ¶ 41.)  The Doe Trust sent notice of the change of ownership to PHL on or about October 1, 2009, and PHL recorded that the owner and beneficiary of the Policy had changed.  (*Id.* ¶ 42.)

US Bank subsequently acquired the Policy and made premium payments on the Policy from the time of its acquisition until Mr. Doe's death on November 4, 2011.  (*Id.* ¶¶ 43, 55.)[2]  US Bank does not specify how much it paid in premiums, but it alleges that PHL received a total of $389,000 in premiums under the Policy.  (*Id.* ¶ 54.)

Prior to Mr. Doe's death, US Bank received various communications from PHL that "led [US Bank] to believe [PHL] did not intend to contest the validity of the Policy" and "induced [US Bank] to make additional premium payments."  (*Id.* ¶¶ 43-44.)  These

---

[2] US Bank does not note when it acquired the Policy or whether the Policy was transferred additional times prior to US Bank's acquisition of the Policy.  US Bank does explain that it acquired the Policy sometime after the Policy's "contestability period" had expired.  (*Id.* ¶ 43.)  By statute, the Policy was required to include a provision stating that it was "incontestable after it has been in force during the Insured's lifetime for two years from the Issue Date."  (*Id.* ¶ 38.)  Although the Policy was issued on June 23, 2008, its "Issue Date" was listed as January 21, 2008.  (*Id.* ¶ 37; Ex. 5.)  Thus, US Bank seems to allege that it acquired the Policy sometime between January 21, 2010 and November 4, 2011.

communications included an Annual Policy Summary on January 20, 2011, stating, among other things, that the Policy was "In Force," had a certain "Value," and that US Bank would face a surrender charge of approximately $150,000 if it surrendered the Policy. (*Id.* ¶ 44.)  Similarly, PHL sent a policy illustration to US Bank on October 21, 2011, stating that the Policy was in force, had value, and had "Net Death Proceeds" of $3,000,000. (*Id.* ¶ 49.)

The Policy provides that if the insured dies while the Policy is in force, PHL will pay the death proceeds no later than two months after receipt of proof of death. (*Id.*, Ex. 5 at 10.)  On November 14, 2011, prior to US Bank submitting a claim for benefits, PHL sent a letter to Mr. Doe's widow, who was neither an owner nor the beneficiary of the Policy at the time, requesting that she provide proof of Mr. Doe's death, complete the Beneficiary Statement, complete an affidavit as to the "Extent of Interest," and return the Policy. (*Id.* ¶¶ 57-58.)  PHL then retained an investigative firm to interview Mr. Doe's widow. (*Id.* ¶ 59.)

US Bank submitted a claim for the proceeds of the Policy, along with a copy of Mr. Doe's death certificate, on December 22, 2011. (*Id.* ¶ 60.)  PHL responded by letter on January 6, 2012, stating that there were issues concerning Mr. Doe's consent to the Policy and the existence of an insurable interest at the time of issuance. (*Id.*, Ex. 8.)  PHL demanded that US Bank produce many documents to assist it in its investigation of "the circumstances surrounding Mr. Doe's application for the Policy." (*Id.*)  PHL requested documents reflecting "the reasons [Mr. Doe] applied for the Policy," "the

source of funds for premiums paid on the Policy," and "the income and net worth of [Mr. Doe] at the time the [P]olicy was applied for." (*Id.*)

On January 20, 2012, US Bank sent a letter to PHL stating that it had already provided PHL with all of the information required to entitle it to the death proceeds. (*Id.*, Ex. 9.) US Bank also explained that when the Policy was issued, "[Mr. Doe] (as the insured), the [Doe Trust] (as the purchaser of the policy) and [Mrs. Doe] (as the ultimate beneficiary of the policy) all possessed an insurable interest in the life of [Mr. Doe]." (*Id.*) On January 27, 2012, PHL sent another letter to US Bank, stating that its concerns about the circumstances surrounding the application and the lack of an insurable interest arose from information PHL received from Mr. Doe's widow, and again requesting documentation to assist in its investigation. (*Id.*, Ex. 10.)[3]

On February 16, 2012, US Bank provided PHL with a copy of a signed, notarized document that was executed by Mr. and Mrs. Doe in conjunction with the transfer of the Policy to PFG Loans. (*Id.* ¶ 67; Ex. 11) The document stated that Mr. Doe transferred the Policy voluntarily, willingly, and after considering the advantages and disadvantages of a sale of the Policy. (*Id.*) On March 1, 2012, more than two months after US Bank submitted its initial claim for benefits, PHL wrote to US Bank acknowledging receipt of

---

[3] PHL alleges in its counterclaim that it learned from Mr. Doe's widow that Mr. Doe had been approached prior to purchasing the Policy and was offered $90,000 in exchange for agreeing to purchase a life insurance policy that would be payable to investors upon his death. (Countercl. ¶ 27, May 15, 2012, Docket No. 9.) For purposes of PHL's motion to dismiss US Bank's claims, the Court is required to focus on the facts alleged by US Bank and accept those facts as true.

the consent document but again refusing to pay the death benefits and requesting the same categories of documents.  (*Id.* ¶ 68; Ex. 12.)  US Bank responded with a final demand for benefits on March 9, 2012.  (*Id.*, Ex. 13.)

## II.   OTHER POLICIES

In support of its CUTPA claim, which requires US Bank to allege an illegal "general business practice" as opposed to an isolated instance of misconduct, US Bank's complaint includes allegations about PHL's conduct in relation to several other insurance policies.

### A.   The Doe II Policies and the Doe III Policy

US Bank alleges that PHL illegally and in bad faith delayed paying death benefits under three other insurance policies of which US Bank was the beneficiary.  Two of those policies, ("the Doe II Policies"), were the subject of a separate action in federal district court: *U.S. Bank N.A. v. PHL Variable Insurance Co.*, No. 2:12-cv-03046 (C.D. Cal.) ("Doe II").  US Bank alleges that PHL failed to respond to its proofs of claims, forcing US Bank to file the Doe II action.  (SAC ¶ 77.)  PHL allegedly feigned concern that the Doe II policies were subject to collateral assignments to two other banks, although PHL had received notice that the assignments had previously been released.  (*Id.* ¶ 78.) US Bank contends that "[PHL]'s purported concern about these released liens was an obvious pretext to delay paying $20,000,000 to [US Bank] so that [PHL] could enjoy the use of those funds as long as possible." (*Id.* ¶ 81.)

US Bank's breach of contract claim was not adjudicated in the Doe II action because PHL paid the death benefits plus interest to US Bank approximately four months after the initial request. *Doe II* at 2, Mar. 11, 2013, Docket No. 247. The district court in the Doe II action denied PHL's motion for summary judgment on US Bank's implied covenant of good faith and fair dealing claim and granted PHL's motion for summary judgment on US Bank's CUTPA claim. *See id.* A jury found in favor of PHL on US Bank's implied covenant of good faith and fair dealing claim. *See Doe II*, Judgment, Apr. 5, 2013, Docket No. 346.[4] U.S. Bank's appeal of the CUTPA ruling is pending. *See Doe II*, Notice of Appeal, May 3, 2013, Docket No. 366.

US Bank initiated a second, related action against PHL in the same district alleging that PHL relied on the same purported concern about collateral assignments it knew had been released in order to delay paying $10,000,000 in benefits on a third policy. *U.S. Bank N.A. v. PHL Variable Insurance Co.*, No. 2:12-cv-03047 (C.D. Cal.) ("Doe III"). The district court in the Doe III action denied PHL's motion to dismiss US Bank's CUTPA claim. *See Doe III*, Nov. 15, 2012, Docket No. 91. It appears that PHL eventually paid the benefits at issue in the Doe III action, which resolved the breach of contract claim, and the parties voluntarily stipulated to have US Bank's remaining claims

---

[4] PHL requests that the Court take judicial notice of the summary judgment order and the judgment in the Doe II action, and the Court will do so. The Court will also take judicial notice of various proceedings in the other actions described in US Bank's complaint and the parties' memoranda. *See Donner v. Alcoa, Inc.*, 709 F.3d 694, 697 n.2 (8th Cir. 2013) ("Federal courts may sua sponte take judicial notice of proceedings in other courts if they relate directly to the matters at issue." (internal quotation marks and alterations omitted)).

dismissed without prejudice pending the resolution of the appeal of the Doe II action. *See id.*, May 6, 2013, Docket No. 166.

### B.     The Close Policy

US Bank next points to a pending action in this District in which it is alleged that PHL has refused to pay benefits on a life insurance policy based on a pretextual contention that the policy is void for a lack of insurable interest. *See PHL Variable Ins. Co. v. Bank of Utah*, Civ. No. 12-1256 (D. Minn.) ("Close"). US Bank alleges that in the Close action, PHL failed to promptly reach a decision on the claim for benefits and "asserted a number of facially improper excuses for its delay." (SAC ¶ 106.) It was not until four months after the claim for benefits that PHL denied the claim and initiated a declaratory judgment action. (*Id.* ¶ 108.) In the Close action, the district court granted PHL's motion to dismiss the counterclaimant's CUTPA claim, and the counterclaimant's breach of contract and unjust enrichment counterclaims are still being litigated.

### C.     The Jackson, Levy, and Griggs Policies

US Bank also provides information about three instances in which PHL allegedly refused to pay benefits on the basis that the claimants would not complete a "post-claim questionnaire" that was, in fact, not required in order to establish eligibility for benefits. (*See id.* ¶¶ 115-19, 128-31, 135.) US Bank alleges that PHL's conduct in these three other instances is illustrative of PHL's general practice of raising pretextual justifications to refuse to pay, or delay the payment of, life insurance proceeds. (*Id.* ¶ 123, 133, 136.)

PHL appears to have settled the actions that involved the Jackson and Levy policies. *See PHL Variable Ins. Co. v. Benjamin*, No. 12-cv-4556 (C.D. Cal.), July 30, 2012, Docket No. 13; *Wells Fargo Bank NA v. PHL Variable Ins. Co.*, No. 12-cv-3760 (N.D. Tex.), May 7, 2013, Docket No. 19. The action involving the Griggs policy is pending. *See PHL Variable Ins. Co. v. ESF QIF Trust*, No. 12-cv-319 (D. Del.).

## ANALYSIS

## I.   STANDARD OF REVIEW

Reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party. *See, e.g.*, *Turner v. Holbrook*, 278 F.3d 754, 757 (8th Cir. 2002). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.* (internal quotation marks omitted). The Court may consider judicially noticed materials on a motion to

dismiss. *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003). The Court

may also consider any documents attached as exhibits that are necessarily embraced by

the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

## II.    CUTPA

CUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade

or commerce" and provides a private right of action.  *See* Conn. Gen. Stat. §§ 42-110b,

110g.  US Bank's CUTPA claim is premised on PHL's alleged violations of another

statute, the Connecticut Unfair Insurance Practices Act ("CUIPA").  Conn. Gen. Stat.

§ 38a-816(6).  To prevail on a CUTPA claim that is premised on CUIPA violations, a

plaintiff must make allegations that, if true, would actually amount to a CUIPA violation.

*See Mead v. Burns*, 509 A.2d 11, 18 (Conn. 1986).

"[A] claim under CUIPA predicated upon alleged unfair claim settlement practices

. . . requires proof that the unfair settlement practices were committed or performed 'with

such frequency as to indicate a general business practice.'"  *Lees v. Middlesex Ins. Co.*,

643 A.2d 1282, 1285 (Conn. 1994) (quoting Conn. Gen. Stat. § 38a-816(6)).  "The

definition of unacceptable insurer conduct in [CUIPA] reflects the legislative

determination that isolated instances of unfair insurance settlement practices are not so

violative of the public policy of this state as to warrant statutory intervention."  *Mead*,

509 A.2d at 19.  A "defendant's alleged improper conduct in the handling of a single

insurance claim, without any evidence of misconduct by the defendant in the processing

of any other claim, does not rise to the level of a 'general business practice.'" *Lees*, 643

A.2d at 1286.

CUIPA sets forth many types of misconduct that amount to "unfair claim

settlement practices" if they are performed "with such frequency as to indicate a general

business practice," including:

> (A) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; (B) failing to acknowledge and act with reasonable promptness upon communications with respect to claims arising under insurance policies; (C) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; (D) refusing to pay claims without conducting a reasonable investigation based upon all available information; (E) failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; (F) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear; (G) compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; . . . (N) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement . . . .

*See* Conn. Gen. Stat. § 38a-816(6).

PHL contends that US Bank has not alleged any unfair claim settlement practices.

It also contends that even if US Bank has alleged unfair claim settlement practices, it has

not alleged a sufficient trend of conduct to satisfy the "general business practice"

requirement. The Court will address these issues in turn.

## A. Unfair Claim Settlement Practices

US Bank alleges that PHL knew that the Doe Policy had been transferred to a third

party and continued to accept premium payments and represent that the Policy was in

force without expressing any concerns or conducting any investigation.  (SAC ¶¶ 42-54.)

Yet, after Mr. Doe died, at which point PHL would stop receiving premiums and would

be expected to pay the Policy's benefits, PHL began an investigation by contacting

Mr. Doe's widow who was no longer an owner or a beneficiary of the Policy.  (*Id.* ¶¶ 55-

59.)  US Bank alleges that it provided all the material that was required to entitle it to

benefits and PHL's purported concerns about the Policy were pretextual.  (*Id.* ¶¶ 60-69.)

The purpose of PHL's tactics with respect to the Doe Policy and other policies, according

to US Bank, is to delay payment of claims so that PHL can earn interest and investment

income on the funds and also to pressure claimants to settle claims for less than their full

value in order to avoid costly litigation to collect benefits.  (*See, e.g.*, SAC ¶¶ 2, 16, 69.)

These allegations, if true, could amount to a variety of unfair claim settlement

practices under CUIPA.  For example, the fact that PHL exhibited no suspicion and

conducted no investigation during the application period and during the years in which it

was collecting premiums, and then decided to conduct an investigation only when

benefits became due, could support a finding that PHL "fail[ed] to adopt and implement

reasonable standards for the prompt investigation of claims."  (*See* SAC ¶ 154; Conn.

Gen. Stat. § 38a-816(6)(C).)  As another example, although PHL asserts that any delays

were due to US Bank's lack of cooperation during the investigation, US Bank asserts that

the investigation was baseless and untimely, and PHL's conduct could support a finding

that it "fail[ed] to affirm or deny coverage of claims within a reasonable time after proof

of loss statements ha[d] been completed."  (*See* SAC ¶ 154; Conn. Gen. Stat. § 38a-

816(6)(C).)   Thus, the Court finds that US Bank has successfully alleged that PHL engaged in unfair claims settlement practices, as defined in CUIPA.

### B.      General Business Practice

The Court will now turn to whether US Bank has alleged enough misconduct to potentially establish a general business practice.   While it is clear that a plaintiff must point to more than one instance of misconduct to survive a motion to dismiss, *Mead*, 509 A.2d at 16, there is no bright line rule for how many instances of unfair conduct must be alleged or how similar the instances must be in order to potentially amount to a general business practice, *see, e.g.*, *Cole v. Aetna Life & Cas.*, 70 F. Supp. 2d 106, 114 (D. Conn. 1999) (denying a motion to dismiss where a pro se plaintiff alleged only two instances of misconduct).

Here, US Bank's complaint describes in detail PHL's treatment of the Doe Policy as well as seven other policies that amounted to approximately $50,000,000 in death benefits.   Although the alleged conduct is not identical in each instance, the allegations share the common theme that PHL regularly refuses to pay, or delays the payment of, life insurance proceeds on the basis of pretextual justifications.   Further, all of the misconduct alleged in the complaint occurred within a narrow window of time – less than one year.

Assuming the truth of all of US Bank's allegations and drawing reasonable inferences in US Bank's favor, as the Court must at this stage, the Court finds that US Bank has plausibly alleged that PHL has a general business practice of unfair claim settlement practices.    US Bank's detailed allegations describing PHL's similar

misconduct relating to several other policies over a short period of time are sufficient to entitle US Bank to discovery on its CUTPA claim.  *See, e.g.*, *Tucker v. Am. Int'l Grp., Inc.*, No. 3:09-CV-1499, 2012 WL 685461, at *4 (D. Conn. Mar. 2, 2012) ("It logically follows that where there are numerous, similar complaints of unfair practices, one may, upon further investigation, compile the necessary facts to determine whether such practices occurred."); *Doe III*, No. 2:12-cv-03047 (C.D. Cal.), Order at 4, Nov. 15, 2012, Docket No. 91 ("Plaintiff . . . describes three other cases supportive of a general business practice involving the settlement of claims. . . .  These allegations are sufficient to state a general business practice by Defendant . . . .").

PHL contends that US Bank's allegations regarding other policies that have been the subject of separate actions cannot establish a general business practice because none of those actions have resulted in a finding on the merits that PHL engaged in misconduct. The Court recognizes that some district courts have found that allegations relating to other actions cannot serve to establish a general business practice unless they have resulted in a finding of wrongdoing.  *See, e.g.*, *Hawkeye, LLC v. Zurich Am. Ins. Co.*, No. 3:10-CV-899, 2011 WL 1216408, at *2 (D. Conn. Mar. 29, 2011).  In *Hawkeye*, a plaintiff pointed to eight other cases that had been filed against the defendant, but did not "explain the status of the cases and whether a finding that [defendant] engaged in that practice was made, and there are no allegations with respect to the resolution of the cited cases." *Id.*  Thus, the court found that "there are no allegations that [defendant] engaged in insurer misconduct in those cases." *Id.*; *see also PHL Variable Ins. Co. v. Bank of Utah*, Civ. No. 12-1256, 2012 WL 4815638, at *4 (D. Minn. Oct. 10, 2012) (discussing

*Hawkeye* and finding that a plaintiff "similarly failed to connect its citations [to other actions filed against the insurance company] to any findings of wrongdoing").[5]

However, US Bank does not merely point to the existence of other actions against PHL as purported evidence of PHL's general business practice. Rather, PHL describes the conduct underlying those actions. The fact that PHL's conduct in relation to the other policies has not been finally adjudicated either because the cases are pending or because the actions settled does not mean that PHL did not engage in misconduct with respect to the other policies. To prevail on its CUTPA claim, US Bank will of course need to prove that such misconduct occurred, but at this stage, the plausible allegations are sufficient. CUIPA does not require prior findings of wronging in other legal actions to establish a general business practice. *See* Conn. Gen. Stat. § 38a-816(6).[6]

PHL also contends that the alleged conduct involving the other policies is too dissimilar to the alleged conduct involving the Doe Policy to support a finding of a general business practice. US Bank must allege "that the unfair settlement practices were

_____

[5] The Court also notes that some courts have imposed a similar requirement at the summary judgment stage. *See, e.g.*, *Craig v. Colonial Penn Ins. Co.*, 335 F. Supp. 2d 296, 308-09 (D. Conn. 2004) (finding that a separate action in which the insurance company's summary judgment motion was denied was not evidence of a general business practice because there was no finding of wrongdoing); *Doe II*, No. 2:12-cv-03046 (C.D. Cal.), Order at 6, Mar. 11, 2013, Docket No. 247 ("[T]hese disputes have settled or have not been adjudicated on the merits. Thus, these declarations amount to mere allegations, not determinations of wrongdoing. Absent a determination of wrongdoing, Plaintiff has not created a triable issue of material fact as to its CUTPA claim." (citations omitted)).

[6] Only Conn. Gen. Stat. § 38a-816(6)(G) appears, on its face, to require a particular outcome in a separate action to support a finding of a particular unfair claim settlement practice. *See id.* ("[C]ompelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than **the amounts ultimately recovered in actions** brought by such insureds." (emphasis added)).

committed or performed 'with such frequency as to indicate a general business practice.'"
*Lees*, 643 A.2d at 1285 (quoting Conn. Gen. Stat. § 38a-816(6)).  Thus, if the other instances of misconduct alleged by US Bank did not involve the practice US Bank complains of in the present action, the other instances could not establish a "general business practice." *See Paul Revere Life Ins. Co. v. DiBari*, No. 3:08CV1795, 2010 WL 918084, at *6 (D. Conn. Mar. 11, 2010) ("[The claimant] listed and described seven court cases resulting in awards against [the insurance company] to show a general business practice, but [the claimant]'s own description of these cases show them not to involve the practices of which [the claimant] complains." (citation omitted)); *Craig*, 335 F. Supp. 2d at 309 (finding that the insurance company's loss in another action was "not evidence of a general business practice of unfair claims settlement" because it involved "a violation of a . . . statute . . . that is not at issue").

Here, US Bank's allegation is that "PHL has engaged in a pattern of resisting claims and manufacturing and citing pretextual reasons so that PHL can delay payment of their claims and hope to extract a settlement for less than the full amount."  (Pl.'s Mem. in Opp'n at 20, Jan. 7, 2013, Docket No. 65.)  While the various instances described by US Bank are not identical, they each fall within this description, which the Court finds sufficiently narrow to amount to a general business practice.  *See Doe III*, No. 2:12-cv-03047 (C.D. Cal.), Order at 4 ("Plaintiff's CUTPA allegations . . . are not limited only to alleged unfair claim settlement practices involving manufactured concerns over ownership of policies.  Rather, Plaintiff alleges that Defendant has engaged in a pattern of

wrongfully resisting and delaying claims for **any** pretextual reason . . . .   This is precisely the type of conduct at issue in the three other cases." (emphasis in original)).

PHL additionally argues that US Bank's allegation that PHL has a general business practice of unfair claim settlement practices is contradicted by US Bank's allegation that PHL is motivated in part by a desire to retaliate against US Bank for a having instituted a separate action against PHL.  (*See* SAC ¶ 6.)  The Court finds US Bank's allegations consistent.  The fact that PHL's alleged misconduct toward US Bank may have been motivated in part by a desire for retaliation that is unique to US Bank does not make US Bank's allegations regarding other instances of misconduct on other policies any less forceful or indicative of a general business practice.[7]

As a final note, PHL argues that the district court's grant of summary judgment on US Bank's CUTPA claim in *Doe II* bars US Bank's CUTPA claim in the present action on the basis of res judicata.  While the allegations brought by US Bank in *Doe II* are very similar to the allegations brought by US Bank in the present action, the Court finds that the grant of summary judgment in *Doe II* is not res judicata in the present action.

The preclusive effect of a judgment of a federal court sitting in diversity is governed by the law of the state in which the court sits.  *Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).  Under California law, the judgment in *Doe II* is

---

[7] The parties dispute the significance of regulatory filings that US Bank contends demonstrate that PHL resists a much greater percentage of claims than the industry average.  The Court's decision on the present motion is driven by US Bank's specific allegations regarding PHL's conduct relating to other policies, not US Bank's reference to general statistics.  Nonetheless, it is possible that such statistics will be relevant at later stages of the litigation.

not final for purposes of res judicata because the appeal is pending.   *See Manco Contracting Co. (W.W.L.) v. Bezdikian*, 195 P.3d 604, 611 (Cal. 2008).   Additionally, even if the judgment were considered final, res judicata would be inappropriate because the facts relevant to the "general business practice" inquiry are continually evolving as PHL responds to additional claims and as other actions involving PHL arise and progress. *See Hurd v. Albert*, 3 P.2d 545, 549 (Cal. 1931) ("The doctrine of res judicata was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, . . . new facts have occurred which may have altered the legal rights or relations of the litigants.").

For the reasons explained above, the Court will deny PHL's motion to dismiss US Bank's CUTPA claim.

## III.   FRAUD

PHL also moves to dismiss US Bank's fraud claim.   PHL contends that US Bank has failed to identify any fraudulent misrepresentations or omissions and that the fraud claim is barred by the "independent duty rule."

### A.   PHL's Fraudulent Misrepresentations or Omissions

US Bank alleges that PHL made fraudulent misrepresentations and omissions in its various communications with US Bank prior to Mr. Doe's death.   (SAC ¶ 161-62.) Specifically, US Bank contends that PHL's representations that the Policy was "issued," "in force," and had "value," were false because PHL actually believed the Policy was void and intended to challenge the Policy's validity, and also that PHL had a duty to

disclose to US Bank that it did not believe the Policy was valid and intended to investigate and challenge the Policy. (*Id.* ¶¶ 161-68.)  For the reasons below, the Court will grant PHL's motion with respect to affirmative misrepresentations but deny the motion with respect to the allegedly fraudulent nondisclosures.

The first element of a fraud claim is that "there was a false representation . . . of a past or existing material fact susceptible of knowledge." *Specialized Tours, Inc. v. Hagen*, 392 N.W.2d 520, 532 (Minn. 1986).  The thrust of US Bank's allegation is that PHL's representations that the Policy was "in force," "issued," and had "value" were misleading because PHL actually believed that the Policy was void and intended to challenge its validity.  However, the representations made by PHL relate to the status of the Policy at the time, not to PHL's beliefs or intentions.  PHL's representations about the status of the Policy were not false even though they may have been misleading if they concealed PHL's intention to challenge that status.  At the time of PHL's representations, the Policy was technically "in force," "issued," and had "value," just as PHL represented.  Thus, the Court finds that to the extent US Bank's fraud claim is based on affirmative misrepresentations, the claim fails.

US Bank also alleges that PHL had a duty to disclose that it believed the Policy was void and intended to challenge its validity.  A party may be liable for fraudulent nondisclosure only if there is a duty to disclose.  *See Richfield Bank & Trust Co. v. Sjorgren*, 244 N.W.2d 648, 650 (Minn. 1976).  There are limited circumstances in which such a duty arises, at least two of which are relevant to the present action.  First, "[o]ne who speaks must say enough to prevent his [or her] words from misleading the other

party." *Id.* (internal quotation marks omitted).   Second, "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party." *Id.* (internal quotation marks omitted).

US Bank alleges that the communications it received from PHL were misleading because they led US Bank to believe that PHL intended to honor the Policy when, in fact, PHL believed the Policy was void and intended to challenge it.  (SAC ¶ 166.)  US Bank also alleges that PHL had sole knowledge of its beliefs and intentions regarding the Policy.  (*Id.* ¶ 168.)  Thus, US Bank contends that PHL had a duty to disclose that it considered the Policy invalid and intended to challenge it.  (*Id.* ¶ 167.)

Assuming the truth of US Bank's allegations, the Court finds that they are sufficient to give rise to a duty to disclose.  If PHL in fact believed that the Policy had not been validly issued and intended to challenge it as void, it would have been misleading for PHL to repeatedly inform US Bank that the Policy was in force and continue to collect premiums from US Bank without disclosing this information.  Further, US Bank has sufficiently and plausibly alleged that PHL had special knowledge of the material fact that PHL believed the Policy was invalid, and that US Bank did not have access to this information.

PHL contends it cannot be liable for fraudulent nondisclosure because it had no duty to confirm whether it intended to honor a future claim.  PHL cites an order from this District finding that "[a]n insurer does not have a duty to disclose to an insured the insurer's interpretation of a policy unless the insurer has affirmatively undertaken the obligation to do so." *Ohio Sav. Bank v. Duncanson*, Civ. No. 05-45, 2006 WL 2583413,

at *5 (D. Minn. Sept. 6, 2006), *aff'd sub nom. Ohio Sav. Bank v. Progressive Cas. Ins. Co.*, 521 F.3d 960 (8th Cir. 2008).  Whether or not this is an accurate statement of law, in the present case it is not PHL's interpretation of the Policy that US Bank contends PHL had a duty to disclose.  Rather, it is PHL's belief that the entire policy is invalid.  If PHL in fact believed that the Policy was void and intended to challenge its validity upon Mr. Doe's death, PHL may have had an obligation to disclose that information to US Bank.

### B.     The Independent Duty Rule

PHL also argues that US Bank's fraud claim is barred by the independent duty rule, which provides limitations on when a party may assert tort claims against another with whom the party has a contractual relationship.  *See Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).  If a party's tort claim is based on a breach of duty that "is indistinguishable from the breach of contract," the tort claim will fail, but if "a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself," the tort claim is viable.  *Id.* (internal quotation marks omitted).  Put differently, "[a] fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract." *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998); *see also Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 887 (8th Cir. 2000) ("[A]n independent fraudulent concealment claim will not lie where the fraudulent concealment relates to a promisor's duties under the contract.").

PHL contends that its relationship with US Bank is exclusively contractual and that US Bank's fraud claim relates to the contract and is therefore barred. The Court finds that PHL's argument does not withstand scrutiny. US Bank's fraud claim arises from different conduct than its breach of contract claim. The breach of contract claim is based on PHL's refusal to pay the death benefit after US Bank submitted its claim. The fraud claim, on the other hand, is based on PHL's failure to disclose its belief that the Policy was void during the time period leading up to Mr. Doe's death, while US Bank continued to pay premiums. *See McDonald v. Johnson & Johnson*, 776 F.2d 767, 770 (8th Cir. 1985) (allowing claims for both fraud and breach of contract because "the fraud and contract claims of the plaintiffs in this case arose at different times and from different acts"); *Jones v. W. Union Fin. Servs., Inc.*, 513 F. Supp. 2d 1098, 1101 (D. Minn. 2007) (applying the independent duty rule and barring a tort claim where "plaintiffs allege a breach of duty identical to the breach of contract").

While US Bank's fraud claim certainly "relates" to the subject matter of the parties' contract, it does not relate to a particular term of the contract that the Court has identified or PHL has highlighted. *See AKA Distrib.*, 137 F.3d at 1087 ("The fraud claim is that Whirlpool lied when it said AKA would be a distributor for a long time. But duration was a term of the contract, and breach of that term was the basis for AKA's time-barred contract claim."). As alleged, US Bank's fraud claim is not a claim that PHL breached a term of the Policy. The conduct underlying the fraud claim is appropriately

brought in tort because it would not amount to a breach of a term of the Policy, but may amount to a breach of the duty not to commit fraudulent nondisclosure, discussed above.[8]

For these reasons, the Court will deny PHL's motion to dismiss US Bank's fraud claim to the extent that the fraud claim is premised on fraudulent nondisclosure.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that PHL's partial motion to dismiss [Docket No. 55] is **GRANTED in part** and **DENIED in part** as follows:

1.    PHL's motion to dismiss US Bank's CUTPA claim is **DENIED**.

2.    PHL's motion to dismiss US Bank's fraud claim is **DENIED** to the extent that the fraud claim is based on fraudulent nondisclosures and **GRANTED** to the extent that the fraud claim is based on affirmative misrepresentations.


DATED:  June 14, 2013                            _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                                  JOHN R. TUNHEIM
                                                        United States District Judge

---

[8] Additionally, the damages for the breach of contract claim and the fraud claim are not identical.  The primary damages for the breach of contract are the death benefits, while the primary damages for the fraud claim are the premiums that US Bank was induced to continue paying, which it believes it will be entitled to recover if it does not recover the death benefits.